In the Matter of PHILIP K. EICHNER, on Behalf of JOSEPH C. Fox, Respondent. DENIS DILLON, as District Attorney of Nassau County, Appellant.

Second Department, March 27, 1980

432

### APPEARANCES OF COUNSEL

*Denis Dillon, District Attorney (William C. Donnino, Anthony J. Girese* and *Judith R. Sternberg* of counsel), appellant *pro se.*

*Levine & Grossman (William Levine* of counsel), for respondent.

*Mulholland, Minion, Roe & Clifford (Robert C. Minion* and *John F. Mulholland* of counsel), for guardian ad litem.

*Hahn, Hand & Ford (Thomas J. Ford, David J. Fleming, Edward J. Walsh Jr., Raymond Fleck, Jr.* and *Donald J. Steller* of counsel), for the Catholic Lawyers Guild of the Diocese of Rockville Centre, *amicus curiae.*

*A. Lawrence Washburn, Jr.,* for Human Life Amendment, Inc., *amicus curiae.*

*Thomas J. Dillon,* for New York State Right to Life Committee, Inc., *amicus curiae.*

**OPINION OF THE COURT**

MOLLEN, P. J.

This appeal concerns the right of a terminally patient in a comatose and essentially vegetative state to have extraordinary life-sustaining measures discontinued, and thereby to permit the process of death to run its natural course. The case raises issues which involve not only the life of the patient, but the interest of the State in maintaining that life. The issues are not difficult to frame, but their resolution will have a profound and far-reaching impact in a world where advances in medical technology sometimes blur the distinction between life and death. Ultimately, the question is whether the judicial system has the power to authorize termination of life-preserving measures and thereby, presumably, of life itself.

## I

At the time this proceeding was commenced, Brother Joseph Charles Fox, an 83-year-old member of the Roman Catholic Order of the Society of Mary (S. M.), lay terminally ill in Nassau Hospital in a state which was described as a permanent or chronic vegetative coma. He had been in that state since October 2, 1979, when he suffered a cardiac arrest during surgery, with resulting severe and irreversible brain damage. The petitioner, Rev. Philip K. Eichner, S. M., thereafter instituted a proceeding pursuant to article 78 of the Mental Hygiene Law, *inter alia,* to have Brother Fox declared incompetent, and to obtain judicial approval for the withdrawal of the respirator which assisted his breathing and was believed to be solely responsible for keeping him alive.

An order approving the withdrawal of the respirator was issued by Special Term, and the District Attorney, who has opposed the petition throughout, appealed to this court. On January 24, 1980, however, shortly after the argument of this appeal, Brother Fox died of congestive heart failure despite the assistance of the respirator.

■ In assessing our obligations at this point, we recognize that, because the profound and difficult issues which underlie this proceeding transcend the tragedy which befell Brother Fox, they have not perished with him. We are therefore unwilling to rely on the fact of his death to avoid the task and indeed the responsibility of defining the role of the judicial system in circumstances such as those originally presented to

us. It is important at the outset to address ourselves to the issue of jurisdiction and to state our conclusion that Brother Fox's death neither renders the case moot nor ousts this court of jurisdiction to decide it.

Since the controversy here is one likely to recur and may in the future again evade review, the issues presented are plainly not moot (see *United States v New York Tel. Co.,* 434 US 159, 165, n 6, quoting *Southern Pacific Term. Co. v ICC,* 219 US 489, 515; see, also, *Roe v Wade,* 410 US 113, 125; *East Meadow Community Concerts Assn. v Board of Educ.,* 18 NY2d 129, 135). Moreover, regarding the jurisdictional question, we note that although petitioner relied on article 78 of the Mental Hygiene Law as a procedural vehicle, this proceeding has no true predicate in statutory law. Rather, it constitutes an appeal for the exercise of the court's equity jurisdiction under circumstances which are unprecedented in this State. Therefore, we are not bound in this case by the same rules of survivability as are courts adjudicating a purely legal question (see, e.g., *Armstrong v Du Mont Labs.,* 137 F Supp 659, 663; 1 Am Jur 2d, Abatement, Survival and Revival, § 75, p 105).

It is true that, ordinarily, where only the personal status of a party is involved, and death occurs, we would deem the matter abated (see 1 CJS, Abatement and Revival, § 128b). However, the order at Special Term will likely be accorded significant precedential value should, as is almost certain to occur, the same important issues arise again. Accordingly, much more is involved here than the personal status of Brother Fox. In such circumstances, absent constitutional or statutory constraints, we do not hesitate to assert our inherent judicial power under the common law to continue our jurisdiction in order to meet the exigencies of the judicial problem before us. *(Woods v Lancet,* 303 NY 349, 355; see, also, 15A Am Jur 2d, Common Law, § 16, p 614; cf. *Basso v Miller,* 40 NY2d 233, 240; *People v Hobson,* 39 NY2d 479, 489.) The importance of these recurring questions, the fact that they invariably arise in a setting of urgency and immediacy, and the necessity for speedy and proper adjudication in future cases demand that this court continue to exercise its jurisdiction in this case, confront the issues, and conclude the matter on its merits.

■ We hold that Father Eichner, as committee of the incompetent, was entitled to the relief sought upon fulfillment

of certain specified conditions and, to this extent, we concur with Mr. Justice MEADE's holding at Special Term. We proceed further, however, and specify—for those cases which will arise in the future—the structural legal framework for reaching similar termination-of-treatment decisions, since we agree with Justice MEADE that the decision in this case "could conceivably have serious and profound consequences for the future welfare of all the citizens of this State" (Matter of Eichner [Fox], 102 Misc 2d 184, 186 [Dec. 6, 1979] [hereafter, Decision]). We turn first to a review of the facts.

## II

From the age of 16, Brother Joseph Charles Fox had lived a devout religious life in the Catholic Church. In 1970 he retired to the religious community of the Order of the Society of Mary living on the premises of the Chaminate High School. He had a close relationship with the president of the school, Rev. Philip Eichner, S. M., whom he had known since 1953 when Brother Fox was a prefect of novices during Father Eichner's novitiate. At the time of his retirement, Brother Fox was in excellent health suffering only from an eye condition which limited his vision. He remained both mentally and physically active, taking on duties as the high school's pastor and message co-ordinator.

In late August or early September, 1979, Brother Fox, then 83 years old, was working in the garden as was his usual practice. Apparently, in moving some large tubs of flowers, he sustained an inguinal hernia. His physician recommended that he undergo an operation and corrective surgery was scheduled for October 2, 1979. Prior to the operation, Brother Fox was in good health and entered the hospital with all expectations of a successful recovery. The operation began and was proceeding in normal fashion when, near its conclusion, Brother Fox apparently suffered a cardiac arrest. Emergency procedures were applied in an attempt to revive him. Medication and heart massage were administered while an endotracheal tube was inserted between the tongue and teeth to permit air to flow into the lungs. These measures ultimately produced results in that Brother Fox's heart resumed beating. However, as a consequence of the interruption of the flow of oxygen caused by the cardiac arrest, Brother Fox suffered substantial brain damage. He was removed to the intensive care unit of the hospital and placed on a respirator, a mechan-

ical breathing device used only for those who are extremely ill and in danger of dying. He slipped into a coma from which he was never to emerge and lost all comprehension of his surroundings. Moreover, with the passage of time, he showed little sign of ever regaining a state of sapience or consciousness.

When Father Eichner was informed of Brother Fox's dire condition, he arranged to have him examined by two neurosurgeons. Upon their negative prognosis, Father Eichner approached the hospital authorities and requested that Brother Fox be removed from the respirator. The authorities declined to comply with this request without a direction from the court and consequently Father Eichner, supported by Brother Fox's surviving relatives and members of the religious community, petitioned the court for relief pursuant to article 78 of the Mental Hygiene Law.[1] Father Eichner asked to be appointed the committee for Brother Fox and to be permitted to authorize discontinuance of the life-support system.

In his supporting affidavit, Father Eichner stated that Brother Fox had not regained consciousness since the hernia surgery on October 2, 1979 and that the 83-year-old man was being sustained by the use of "extraordinary life support systems" in Nassau Hospital. Father Eichner further stated his belief that Brother Fox had been rendered "incompetent without any sapient or conscious thought and without any

---

1. Section 78.01 of the Mental Hygiene Law provides in pertinent part that the "supreme court, and the county courts outside the city of New York, have jurisdiction over the custody of a person and his property if he is incompetent to manage himself or his affairs by reason of age, alcohol abuse, mental illness, or other cause, or is a patient [admitted to any facility for the mentally ill or mentally retarded in this State] * * * The court shall preserve the property of a person it declares incompetent * * * In exercising such custody, the court may appoint a committee of the person or a committee of the property, who may be the same or different individuals."

Section 78.03 of the Mental Hygiene Law provides in pertinent part as follows:

"(a) Petitioner * * * Any person may commence a special proceeding to declare a person incompetent and to appoint a committee of an incompetent. * * *

"(d) Notice of petition. Unless the court orders otherwise, notice of petition shall be served upon the alleged incompetent and his spouse or, if none is known to the petitioner, the distributees at the date of the petition, if known * * * The court shall direct such further notice of the proceeding as it deems proper.

"(e) Hearing or trial. Upon the return date of the petition, the matter shall proceed to hearing * * * At any stage of the proceeding the court may * * * appoint a guardian ad litem to represent the interests of the alleged incompetent."

Section 78.15 provides: "(a) Committee subject to control of court. A committee, either of the person or property, is subject to the direction and control of the court by which he was appointed with respect to the execution of his duties".

hope for same in the future." Furthermore, according to Father Eichner, Brother Fox had expressed the wish that if he ever entered into a state where his brain was rendered permanently incapable of sapient or rational thought "the use of extraordinary life support systems" should be discontinued and "nature * * * allowed to take its course." Father Eichner expressly predicated his request for termination of such "extraordinary" life-support systems on Brother Fox's constitutional right to privacy. Father Eichner noted that, since the medical authorities had refused to allow the exercise of that right, he was constrained to institute this proceeding for court authorization to withdraw such extraordinary and artificial life-sustaining systems.

Supporting the verified petition were affidavits by, *inter alia,* the attending physician, Dr. Edward Kelly, and a neurosurgeon, Dr. Nicholas Poloukhine, detailing the extent of irreversible brain damage suffered by Brother Fox, as well as the over-all gravity of his medical condition; specifically, he had "suffered a cardio-respiratory arrest" resulting in "diffuse cerebral and brain stem anoxia"; he was terminally ill, remaining comatose "in a permanent vegetative state * * * and will not, in the future, come out of his permanent vegetative state". Father Eichner's verified petition was also supported by an affidavit by Norbert Mechenbier, the nephew of Brother Fox, who was acting in a representative capacity for the next of kin. He urged that Father Eichner be appointed for the purpose of withdrawing the extraordinary life-support systems.

Pursuant to the direction of the Justice presiding at Special Term, a copy of the petition was served upon the Attorney-General of the State of New York and the District Attorney of Nassau County, as well as upon Brother Fox's relatives. Of these, only the District Attorney of Nassau County sought an opportunity to be heard. He arranged for two specialists to examine Brother Fox, and thereafter submitted papers in opposition to Father Eichner's request to remove Brother Fox from the respirator. Special Term further ordered the appointment of a guardian ad litem for the alleged incompetent.

Special Term subsequently conducted a hearing and took testimony relating both to Brother Fox's medical condition and to his statements purportedly demonstrating a desire not to be kept alive through extraordinary means.

At the hearing, which was held November 14-16, 1979, the

petitioner, Rev. Philip Eichner, S. M. testified that he is an ordained Roman Catholic priest, a member of the Order of the Society of Mary and president of the Chaminade High School as well as superior of the religious Community of the Marianists which resides on the premises of the high school. As a community, the members take vows of poverty, chastity and obedience, and live what Father Eichner termed a "common life" together.

Father Eichner averred that he had known Brother Fox since 1953 and that Brother Fox had taken his vows and lived a devout religious life for 66 years. The petitioner had occasional contact with him until 1970, when Brother Fox asked to join the Chaminade community in retirement. Brother Fox was accepted and initially acted as the pastor and message coordinator of the school. He was a "vibrant" person who, except for an eye condition, enjoyed "excellent" health, remaining both mentally and physically active.

With respect to Brother Fox's views on the use of "extraordinary" life-sustaining measures, Father Eichner testified that in 1976, during the time that "the Karen Quinlan situation"[2] was topical, the members of the Chaminade community engaged in extended discussions as to its significance, particularly in relation to the official position of the Catholic Church as expressed by the *allocutio* of Pope Pius XII and adopted by the New Jersey Church authorities.[3] Father Eichner indicated

---

2. *Matter of Quinlan,* 137 NJ Super 227, revd 70 NJ 10, cert den *sub nom. Garger v New Jersey,* 429 US 922.

3. On November 24, 1957 Pope Pius XII delivered an "allocutio" (address) to a group of anesthesiologists concerning the moral consequences of withdrawing "modern artificial respiration apparatus" "in cases of deep unconsciousness, even in those that are considered completely hopeless in the opinion of the competent doctor". The Pope stated essentially that it was not morally sinful to use such "extraordinary" treatment for a terminal patient. However, neither is it required since such a patient need be given only "ordinary" treatment. Specifically, the Pope stated that as the use of a respirator went "beyond the ordinary means to which one is bound, it cannot be held that there is an obligation to use them or * * * to give the doctor permission to use them * * * There is not involved here a case of direct disposal of the life of the patient; nor of euthanasia in any way; this would never be licit. Even when it causes the arrest of circulation, the interruption of attempts at resuscitation is never more than an indirect cause of the cessation of life" (The Prolongation of Life, Address of Pope Pius XII to an International Congress of Anesthesiologists, Nov. 24, 1957, *AAS* XXXXIX [1957] [Translation from the original French, The Pope Speaks, Spring 1958, vol 4, No. 4, pp 393-398]). The official position of the Catholic Bishops of New Jersey was made clear to the *Quinlan* court through a position statement of Bishop Lawrence B. Casey, Bishop of Paterson, contained in the brief *amicus curiae* of the New Jersey Catholic Conference (see *Matter of Quinlan,* 70 NJ 10, 30-33, *supra).* Likewise

that Brother Fox was an "active" participant in those discussions, agreeing with the position expressed by these religious authorities. In particular, Father Eichner recalled one incident when he heard Brother Fox expressly declare that he "would not want any of this extraordinary business * * * to be done for him."

Finally, Father Eichner testified that the basis of his application was that Brother Fox "is in a static vegetative state and there is no possibility of recovery" of cognitive brain function.

Rev. Francis T. Keenan, S. M., the Provincial Superior of the Society of Mary, testified that he had been associated with Brother Fox since the witness' noviate in 1951. With respect to the Chaminade community's discussions of the *Quinlan* case, Father Keenan testified that about two months prior to the hearing date Brother Fox had said to him, "Well, why don't they just let us go? I want to go." The witness also observed that "Brother Joseph would be a person who would revere the person of the Pope a great deal and the teaching of the church a great deal, and since Pius XII has been very clear on this issue, he would accept it."

Norbert Mechenbier, a nephew of Brother Fox, testified that he had discussed the petition with the nine other surviving blood relatives of Brother Fox. On October 16, 1979, after the operation, Mechenbier had visited Brother Fox in the hospital. Based on the statements of the medical staff, Mechenbier and his relatives favored withdrawal of the respirator unless there was a possibility of improvement beyond "a vegetative state".

Substantial medical testimony was also taken. Dr. Edward Kelly, the attending physician and surgeon who performed the operation, testified as to the details of the surgery and Brother Fox's subsequent medical condition. In mid-September, Dr. Kelly had recommended surgery for Brother Fox to repair an "inguinal hernia", a protrusion of the contents of the abdomen through the abdominal wall. This operation, characterized as routine, was scheduled for October 2, 1979. Such a procedure normally lasts approximately 50 minutes, and the

---

in this proceeding, the position of the Diocese of Rockville Centre on the moral implications of withdrawal of Brother Fox's respirator has been given expression by the statement of Bishop John R. McGann, as reproduced in the brief *amicus curiae* of the Catholic Lawyers Guild of the Diocese of Rockville Centre (see, also, Collester, Death, Dying and the Law: A Prosecutorial View of the *Quinlan* Case, 30 Rutgers L Rev 304, 305).

first 40 minutes were, in fact, "uneventful". However, with the surgery largely completed, a "major catastrophe" occurred: Dr. Kelly noticed a "commotion" at the head of the table in the area where the anesthesiologist stood; it was ascertained that Brother Fox had suffered cardiac arrest. Although manifestation of the signs of cardiac arrest may be sudden, the onset of arrest itself is not, and no one could say with a reasonable degree of medical certainty exactly how much time had elapsed from the onset of the arrest to its apprehension.[4] Subsequently, as a consequence of the arrest, blood ceased to oxygenate Brother Fox's body and this resulted in brain damage, which ordinarily increases in proportion to the duration of the cardiac arrest. Dr. Kelly testified to and described the "heroic measures" which were undertaken following the arrest. These procedures ultimately were successful in restoring cardiac function, although between one and two minutes of additional time elapsed before the achievement of the results, the exact passage of time remaining unknown.

Dr. Kelly testified that Brother Fox was removed to the intensive care unit and placed on a respirator, a mechanical breathing device characterized as an "extraordinary" method of life support and utilized "only in intensive care units for those patients who are extremely ill, critically ill, and in danger of dying".[5] Brother Fox had lapsed into a coma with

4. Dr. Kelly stated that "I had no way of determining how long he had been hypoxic, which means has a lessened concentration of oxygen, to produce enough oxygen going to the brain prior to his sudden arrest. There was no way of determining that. It could have been a matter of a minute, it could have been as long as five or six minutes."

5. According to Dr. Kelly, a respirator is a "mechanical contrivance that takes over for the patient who cannot breathe [or] breathes inadequately on his own. It forces a certain amount of oxygen into the lungs at a certain volume at a certain rate" (see, also, Stedman's Medical Dictionary [3d Unabridged Lawyers ed], p 1091).

In describing life-support systems, extraordinary is apparently not a medical term and the distinction between "ordinary" and "extraordinary" measures remains hazy. One commonly quoted description is as follows: "Ordinary means are all medicines, treatments, and operations which offer a reasonable hope of benefit and which can be obtained and used without excessive pain, or other inconvenience. Extraordinary means are all medicines, treatments and operations which cannot be obtained or used without excessive expense, pain, or other inconvenience, or if used, would not offer a reasonable hope of benefit" (Kelly, The Duty to Preserve Life, 12 Theol Studies 550, quoted in, Byrne, Agathanasia and the Care of the Dying, 112 Can Med A J 1396; see, also, Hirsch and Donovan, The Right to Die: Medico-Legal Implications of In Re Quinlan, 30 Rutgers L Rev 267, 290, n 132, 291, n 138). In the context of this proceeding, the use of a respirator for an individual who does not spontaneously respirate is accepted as an "extraordinary" means of life support.

attendant lack of comprehension of surroundings and "[i]n general * * * a loss of all the functions that we think [of] as intelligence." Dr. Kelly believed that the coma had been induced by "anoxia", lack of oxygen to the brain, following cardiac arrest and consequential brain damage.

Informed by Dr. Kelly of Brother Fox's grave condition, Father Eichner went to the hospital, saw Brother Fox, and arranged to have him examined by two neurosurgeons. Based upon their negative prognosis, Father Eichner approached hospital authorities for permission to withdraw the life-support system, but was informed that his request would not be honored without prior judicial approval. Discussions followed with some of Brother Fox's relatives, as well as with members of the religious community, and Father Eichner eventually decided to seek legal recourse.

In the interim, members of the medical staff continuously monitored and evaluated Brother Fox's medical status. Dr. Kelly saw Brother Fox on a daily basis. As of November 13, 1979, the date prior to his testimony, Dr. Kelly found that the patient had "decerebrated". "He has lack of cerebral function. He is in a coma. He has convulsive episodes that need medication for control and has required that since the date of surgery. He does not respond to stimuli, and he has what we call autonomic, vegetative function, that of kidney function, intestinal function which are working, but he has no knowledge."

Dr. Kelly's opinion was that Brother Fox was in "a deep coma with a substantial loss of respiratory function" caused by "secondary to diffuse cerebral and subcortical anoxia", i.e., lack of oxygen to the brain. The patient had lapsed into an "irreversible" and "permanent vegetative" coma; Dr. Kelly was able to state with a reasonable degree of medical certainty that Brother Fox was neither capable of sapient or rational thought, nor would he be in the future. Dr. Kelly did not believe that Brother Fox could live apart from the respirator. The physician then indicated that after the onset of coma, every patient reaches a "plateau" of improvement, or neurological state of "stabilization". With respect to certain "improvements" observed in Brother Fox's condition in the six weeks since the surgery—viz. disappearance of certain "myoclonic" convulsions with the aid of medication, rare instances of spontaneous respiration, and sensory response to stimuli—Dr. Kelly opined that such improvements had "nothing to do

with higher brain functions * * * [Brother Fox] would remain a vegetable."

Dr. Nicholas Poloukhine, a neurosurgeon, likewise examined Brother Fox and testified as to the results of his examination. Dr. Poloukhine had initially observed Brother Fox in the intensive care unit of the hospital on October 12 and 13, later on the 17th of the month, and also on the morning of the hearing—November 14, 1979. Although he could not determine the exact period between the onset of the arrest and the success of the resuscitation, he estimated it at perhaps five minutes in toto based on Brother Fox's neurological responses. The first two minutes of oxygen deprivation caused by the arrest were "absolutely critical". In agreement with Dr. Kelly, Dr. Poloukhine believed that Brother Fox was in a condition of "irreversible coma, secondary to diffused cerebral and subcortical anoxia" and would eventually die as a result thereof. Ascertainable and irreversible damage had occurred in the areas controlling "sapient function" of the brain. However, "with intensive support care, the patient may * * * remain in a so-called 'permanent vegetative state'." Dr. Poloukhine held to his original opinion that Brother Fox was "unable to function in a sapient or rational manner, and will not in the future come out of his permanent vegetative state." The neurological improvements observed in the six weeks since surgery—rare instances of spontaneous respiration reflected by the patient's "bucking" of the respirator, and the disappearance of myoclonic convulsions—had nothing to do with cognitive function and did not change his mind.

In opposing the petition, the District Attorney sought to establish that Brother Fox was "improving" neurologically, or in the alternative that it was too early to determine his condition because he had yet to reach a state of neurological "stabilization". Toward this end the District Attorney presented two physicians who had conducted a neurological examination at his request. Dr. Eli Goldensohn, a neurologist, reviewed Brother Fox's records and noted "slight improvement" between October 12 and October 17. At the time of Dr. Goldensohn's examination of November 6, he observed some spontaneous respiratory efforts and response to painful stimuli. When asked if the patient was stabilized in a neurological sense, the physician stated that his "impression" was that he was not "absolutely stabilized". Dr. Goldensohn testified as to the varying degrees of coma. "Brain death" is that state

wherein an individual cannot breathe on his own, has no reflexes other than spinal ones, and has an electroencephalogram (EEG)[6] indicating a complete absence of spontaneous electrical activity in the cortex. Since Brother Fox's EEG showed "minimal activity", he did not meet the criteria of "brain death" at the time of the hearing. A "vegetative state", on the other hand, "is a state where the individual is partially responsive * * * but * * * has no significant cognitive functions * * * [although he] does have some primitive cerebral reflexes." Brother Fox was in such a state at this time although Dr. Goldensohn was not certain whether this condition had stabilized. His prognosis was that the chances were "extremely remote" and that it was "entirely improbable" that Brother Fox would ever regain consciousness. The witness believed death would follow in days or weeks if Brother Fox were no longer assisted by the respirator. Any improvements had been in the area of reflexes, not sapient function.

Dr. Richard Beresford, a neurologist, also examined Brother Fox, and his medical opinion was consistent with that of his colleagues. Specifically, he concluded that Brother Fox had entered into a vegetative state and it was "highly improbable" that he would ever regain cognitive function. While there was one case in the medical literature of a 43-year-old man who had fully recovered from a similar vegetative state after 17 months, this was an unexpected "deviation from the normal".

Finally, the guardian ad litem, Robert C. Minion, Esq., testified in favor of granting the relief sought by Father Eichner, including authorization to withdraw the respirator. His report to this effect was also admitted into evidence.

### III

In a thoughtful and extensive opinion issued on December 6, 1979, Special Term made findings of fact and conclusions of law and granted the relief sought by Father Eichner. The two key findings of fact were (102 Misc 2d 184, 188, 189, 193):

(1) that "[a]s a result of diffuse cerebral and subcortical anoxia brought on by cardiac arrest suffered on October 2, 1979, Brother Fox lost the ability to then respirate spontane-

---

6. "EEG", the abbreviation for electroencephalogram, is the record of an electroencephalograph, an "apparatus consisting of amplifiers and a write-out system for recording the electric potentials of the brain derived from leads of the scalp" (Stedman's Medical Dictionary [3d Unabridged Lawyers ed.], p 400). In this manner, brain activity is monitored.

ously and fell into a comatose, vegetative state in which he has since been maintained through use of a respirator * * * He is in a chronic vegetative and akinetic mute state as a result of which only certain lower vegetative functions operate. The higher functions of the brain, the so-called cognitive and sapient functions, have been lost and it is highly improbable that they will ever return. To the extent that any further improvements may occur, they will relate only to Brother Fox's vegetative functioning * * * It was the unanimous conclusion of the physicians who testified in this case, that, to a reasonable degree of medical certainty, there is no reasonable possibility that Brother Fox will ever return from the state he is now in to a condition in which the cognitive and sapient powers of the brain—the ability to feel, see, think, sense, communicate, feel emotions and the like—operate. The prognosis is that Brother Fox, whether on or off the respirator, will die"; and

(2) that "Brother Fox opposed the continued use of life supporting systems like respirators when the chance of recovery from a persistent vegetative state is largely nonexistent and, were he competent at this moment, he would order a termination of the life supporting respirator."

Special Term's primary conclusion of law was that Brother Fox was entitled to have the respirator withdrawn as an exercise of his common-law "right of bodily self-determination", and although he could not personally exercise that right due to his incompetence, his committee, Father Eichner, could exercise it for him since his wishes had been made sufficiently clear, citing *Matter of Quinlan* (137 NJ Super 227, revd 70 NJ 10, cert den *sub nom. Garger v New Jersey,* 429 US 922), and *Superintendent of Belchertown State School v Saikewicz* (— Mass —, 370 NE2d 417). Special Term, however, declined to recognize the right of bodily self-determination as one of constitutional dimension under the so-called "right of privacy", reasoning that the refusal of Nassau Hospital to accede to Father Eichner's request to terminate the respirator did not constitute "State action" for the purpose of the Fourteenth Amendment. Accordingly, Special Term:

(1) adjudicated Brother Fox an incompetent within the meaning of the Mental Hygiene Law;

(2) appointed the petitioner, Father Eichner, as the committee of the incompetent;

(3) directed that Father Eichner be authorized and empow-

ered to terminate the use of the respirator sustaining Brother Fox upon fulfillment of two conditions: (a) that Father Eichner "secure from a physician or physicians of his choice an opinion that the condition of Brother Joseph Charles Fox continues in a chronic vegetative state with no reasonable medical possibility that he will ever regain any sapient or cognitive function" and (b) that in "scheduling the physical examination described immediately above"[7] Father Eichner shall provide the District Attorney of Nassau County at least 48 hours notice in order to give him an opportunity to have a "representative or representatives present for the purpose of observing what transpires";

(4) directed that upon compliance with the conditions described above, and the resulting withdrawal of the respirator, "such action shall not give rise to either civil or criminal liability on the part of any participant, whether committee, physician, hospital or others"; and

(5) expressly confined the authorization to the withdrawal of the respirator alone.

An order to this effect was entered on December 12, 1979.

The District Attorney has appealed from this order.[8] Briefs were submitted and oral argument was heard. Subsequently, on January 24, 1980, while the decision on this appeal was pending, Brother Fox died. As previously noted, however, the controversy does not thus come to an end; we retain jurisdiction and address ourselves to the merits.

Distilling the District Attorney's excellent brief into its basic elements, his argument is as follows:

(1) this court does not have the power to grant the relief ultimately sought in this proceeding—withdrawal of the respirator—at least in the absence of legislation;[9]

---

**7.** Although the necessity for an additional physical examination of Brother Fox prior to termination of the respirator was clearly implicit in condition "(b)", it was not in fact expressly required in condition "(a)". Nevertheless, this court construes Mr. Justice MEADE's intent as requiring a further physical examination.

**8.** The Attorney-General of the State of New York, although previously participating at the hearing has, by letter to this court, dated January 8, 1980, withdrawn from any further participation in the proceeding, and has not taken any official position.

Briefs *amicus curiae* in support of affirmance have been received from the Catholic Lawyers Guild of the Diocese of Rockville Centre, the Human Life Amendment, Inc., and the New York State Right to Life Committee, Inc.

**9.** The District Attorney concedes that Special Term had the power to appoint Father Eichner a committee of the incompetent pursuant to article 78 of the Mental Hygiene Law, but objects "to the granting of the further power to terminate life support".

(2) if this court possesses such power, neither the Constitution nor the common law gives a terminally ill patient, who is incompetent by virtue of being in a permanent vegetative coma, the right to be withdrawn from a respirator; and

(3) even if such a right exists, there was no expression of Brother Fox's intent sufficient to warrant the exercising of that right inasmuch as his purported statements of intent—as testified to by Father Eichner and Father Keenan—were inadmissible hearsay; that is to say, in essence, there is no mechanism by which this right to refuse treatment can be exercised by one other than the incompetent himself. These essentially are the issues presented to this court.

## IV

The genesis of this case, of course, goes far beyond the operation on Brother Fox that came to a tragic conclusion. Ultimately, we must face the fact that technological advances in medicine have generally outpaced the ability of the judicial system to deal comprehensively with them in a manner consistent with the fulfillment of social policy objectives. Subjects that only 15 years ago were within the exclusive domain of such visionaries as Ray Bradbury, Arthur C. Clarke and Isaac Asimov—genetic recombination, microsurgery, transplantation of organs and tissues—are now very real, straining the traditional boundaries of the law. Indeed, even the venerable doctrine of *stare decisis* becomes ineffectual in that it suggests institutional reliance on old answers at a time when the questions themselves have passed beyond the imagination of the judicial sages who formulated the precedents. And while technological advances in medicine have achieved what to laymen are no less than miracles, it is equally true that "the struggle of medical science against death has resulted in its own peculiar horrors" (Collester, Death, Dying and the Law: A Prosecutorial View of the *Quinlan* Case, 30 Rutgers L Rev 304). We speak of a technology that is capable of sustaining an individual in a permanent and irreversible coma for an indefinite period of time. It was the problems spawned by such technological achievements that prompted the ad hoc committee of the Harvard Medical School in 1968 to propose a re-examination of the very definition of death: "From ancient times down to the recent past it was clear that, when the respiration and heart stopped, the brain would die in a few minutes; so the obvious criterion of no heart beat as

synonymous with death was sufficiently accurate. In those times the heart was considered to be the central organ of the body; it was not surprising that its failure marked the onset of death. This is no longer valid when modern resuscitative and supportive measures are used. These improved activities can now restore 'life' as judged by the ancient standards of persistent respiration and continuing heart beat. This can be the case even when there is not the remotest possibility of an individual recovering consciousness following massive brain damage." (Ad Hoc Committee of Harvard Medical School to Examine the Definition of Brain Death, A Definition of Irreversible Coma, 205 JAMA 337, 339; see, also, *Matter of Quinlan,* 70 NJ 10, 26-28, *supra; Matter of Dinnerstein,* — Mass App —, 380 NE2d 134, 135-136, n 2.)

Increasingly, more are drawn to the view that, as one writer put it, the "ultimate horror is not death but the possibility of being maintained in limbo, in a sterile room, by machines controlled by strangers" (Steel, The Right to Die: New Options in California, 93 Christian Century [July-Dec. 1976], as quoted in Comment, North Carolina's Natural Death Act: Confronting Death With Dignity, 14 Wake For L Rev 771; see, also, Heifetz and Mangel, The Right To Die, 9-11; Raible, The Right to Refuse Treatment and Natural Death Legislation, Medicolegal News, vol 5, no. 4, at p 7). The plain fact is that medical technology capable of maintaining individuals indefinitely in a state of irreversible coma has blurred the definition of death and raised questions quite without parallel in the annals of medico-legal jurisprudence. Thus, while the law has traditionally regarded death as an *event,* i.e., the cessation of circulatory and respiratory functions, medical science has come to recognize death as a *process.*[10] Several pre-eminent medical

---

10. *"Death.* The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." (Black's Law Dictionary [rev 4th ed, 1968], p 488.) (For cases where such definition has been applied to resolve questions involving implications of death, see, e.g., *Smith v Smith,* 229 Ark 579, 586; *Thomas v Anderson,* 96 Cal App 2d 371, 376.) The legal consequences resulting from confusion over the definition of death were illustrated in *Douglas v Southwestern Life Ins. Co.* (374 SW 2d 788, 794 [Tex]). In that case, the beneficiary of a Texas decedent could not recover accidental death benefits under the decedent's insurance policy inasmuch as recovery depended on death ensuing within 90 days and the decedent was kept "alive" by sophisticated medical care for a period in excess of 90 days (see, also, Collester, Death, Dying and the Law: A Prosecutorial View of the *Quinlan* Case, 30 Rutgers L Rev 304, 307; Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYUL Rev 285, 287; Note, The

panels—including the previously alluded to ad hoc committee of Harvard Medical School—have attempted to resolve this dilemma by postulating new criteria for the determination of death, commonly referred to as "brain death".[11] This solution, however, has not as yet been accepted as legally conclusive of the issue in this State (but see, *Matter of New York City Health & Hosps. Corp. v Sulsona,* 81 Misc 2d 1002, 1003, 1005-1007 [construing the term "death" under Public Health Law, § 4301, covering anatomical gifts to mean "brain death" in accordance with current medical standards]; see, also, the discussion of *Sulsona,* at Tests of Death for Organ Transplant Purposes, Ann. 76 ALR3d 913).

This new technology also raises complex questions of appropriate medical "ethics", and bears moral, religious and philosophical implications. Choices must be made. When should the respirator be withdrawn? How much effort, if any, should be expended to delay the inevitable moment of death for the incurably and terminally ill? The resolution of such questions will affect not only the patient, but his family, the medical community, and our society as a whole. The *Quinlan* court

Criteria for Determining Death in Vital Organ Transplants—A Medico-Legal Dilemma, 38 Mo L Rev 220, 223, 232; Wasmuth, The Concept of Death, 30 Ohio St L J 33, 36-37; Tests of Death for Organ Transplant Purposes, Ann. 76 ALR3d 913).

**11.** The proposed criteria for brain death recognized by the ad hoc committee of Harvard Medical School included (1) lack of receptivity and response to externally applied stimuli; (2) no movements or breath; (3) no reflexes; and (4) a flat EEG, indicating a total absence of brain activity (Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death, A Definition of Irreversible Coma, 205 JAMA 337, 338). (For a discussion of how some of these criteria have proved difficult to utilize in practice, see Hirsch and Donovan, The Right to Die: Medico-Legal Implications of In Re Quinlan, 30 Rutgers L Rev 267, 291-294; see, also, Hirsch, Brain Death: Medico-Legal Fact or Fiction? 3 N Ky St L F 16.) Not only have 19 States recently adopted new statutory definitions of death (see, e.g., North Carolina Gen Stat, § 90-321 [Cum Supp 1977], but the highest court of at least one State has essentially adopted a brain death standard by judicial fiat (see *Commonwealth v Golston,* — Mass —, 366 NE2d 744, 747-748, cert den 434 US 1039). Moreover, in 1978, the National Conference of Commissioners on Uniform State Laws approved the "Uniform Brain Death Act" as follows: "For legal and medical purposes, an individual who has sustained irreversible cessation of all functioning of the brain, including the brain stem, is dead. A determination under this section must be made in accordance with reasonable medical standards." The commissioners' comment that the word "functioning" in the section "expresses the idea of *purposeful* activity in all parts of the brain, as distinguished from random activity", thus conceivably encompassing the terminally ill patient in irreversible coma. The subject is of more than academic interest since it may well provide the Legislature with the most expeditious solution to this complex problem. (See, generally, R. Veatch, Death, Dying and the Biological Revolution, 21-72; Capron and Kass, A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal, 121 U Pa L Rev 87.)

summed the problem up best by observing simply that the "matter is of transcendent importance" *(Matter of Quinlan,* 70 NJ 10, 19, *supra).*

It is also appropriate to preface analysis of the more complex issues by acknowledging the interest that the District Attorney bears in this proceeding. Conduct which results in the death of a human being who is medically alive quite obviously implicates criminal homicide statutes (see, e.g., Penal Law, § 120.30; § 125.00; § 125.15, subd 3; § 125.25, subd 1, par [b]). Such conduct may take the form of an act, or an omission to act where an affirmative duty to act is imposed by law (see Penal Law, § 15.00, subds 1, 3, 4, 5). The actor's motive, no matter how kindly, is legally irrelevant, and this remains true notwithstanding the fact that the consent of the deceased had been obtained, or that the actor firmly believed his conduct to be morally justified (see 2 Wharton's Criminal Law [14th ed], § 137; *Repouille v United States,* 165 F2d 152, 153-154; see, also, Penal Law, § 120.30; § 125.15, subd 3). Euthanasia,[12] referred to colloquially as "mercy killing", is consequently proscribed by the criminal law, and any physician who, acting on his own, removes a life-sustaining respirator arguably commits some form of homicide.[13] No one dare question the existence of a strong public policy that values and protects the sanctity of life (see, e.g., *Becker v Schwartz,* 46 NY2d 401, 411). Charged with upholding the integrity of the criminal law, the District Attorney is duty bound to concern himself with the conduct of those who propose to do

---

12. "Euthanasia", literally "good death", generally connotes the willful putting to death of an individual. Some observers have sought to differentiate between "active" euthanasia (i.e., causing someone to die) and "passive" euthanasia (merely allowing someone to die) (see, e.g., Rachels, Active and Passive Euthanasia, 292 NEJ Med 78; Note, The "Living Will": The Right to Death with Dignity? 26 Case W Res L Rev 485, 487; Note, Informed Consent and the Dying Patient, 83 Yale L J 1632, 1649-1650; Louisell, Euthanasia and Biathanasia, On Dying and Killing, 22 Cath U L Rev 723, 724). (For further discussion of the euthanasia controversy, see Beneficient Euthanasia [M. Kohl ed, 1975]; Euthanasia and the Right to Death: The Case for Voluntary Euthanasia [A. Downing ed, 1970].)

13. For extensive analyses of the question of civil and criminal liability in the treatment of the terminally ill, see, G. Williams, The Sanctity of Life and the Criminal Law [1957]; Collester, Death, Dying and the Law: A Prosecutorial View of the Quinlan Case, 30 Rutgers L Rev 304, 309-314; Note, The "Living Will": The Right to Die with Dignity? 26 Case W Res L Rev 485, 487-496; Kennedy, The Legal Effect of Requests by the Terminally Ill and Aged Not to Receive Further Treatment from Doctors, 1976 Crim L Rev 217; Foreman, The Physician's Criminal Liability for the Practice of Euthanasia, 27 Baylor L Rev 54; Kamisar, Some Non-Religious Views Against Proposed "Mercy-Killing" Legislation, 42 Minn L Rev 969.

that which seemingly violates that public policy. Moreover, since the ultimate relief sought necessarily would include an injunction against criminal prosecution (Decision, pp 205, 206; see, also, *Matter of Quinlan,* 70 NJ 10, 55, *supra; cf.* Penal Law, § 35.05, subd 1), the interests of judicial economy, as well as simple common sense, require the District Attorney be joined in advance, rather than have him attempt to prosecute a criminal case after the patient has died. Such joinder was likewise consistent with the notice provision of the statute (see Mental Hygiene Law, § 78.03, subd [d]; cf. *Matter of Torsney,* 66 AD2d 281, 286-287, revd on other grounds 47 NY2d 667).

■ Following closely the question of the District Attorney's interest in this proceeding is the true threshold issue of the case: should the courts act at all? The District Attorney argues that Special Term acted in excess of its authority by "fashioning a remedy" which rests entirely on a "court-created legal fiction" particularly inappropriate because it was formulated "in the utter absence of any guiding legislation." In effect, the District Attorney urges that because the results of withdrawing the respirator—which in all likelihood would have hastened Brother Fox's death—are irreversible, and because the public consequences are so profound, the relief sought may not be granted without specific legislative authority. Actually, the question is composed of two separate elements: (1) do the courts have the adjudicatory power to act; and (2) if they do, should that power be exercised in this proceeding absent legislation. That the court has the *power* to entertain and adjudicate this proceeding cannot be doubted. The State has a legitimate interest in asserting its *parens patriae* powers over the mentally incompetent, both to provide care and to safeguard the best interests of those who are physically unable to care for themselves (see *Addington v Texas,* 441 US 418, 426; *O'Connor v Donaldson,* 422 US 563, 575; *Matter of Lublin v Central Islip Psychiatric Center,* 43 NY2d 341, 345; *Matter of Weberlist,* 79 Misc 2d 753, 756; *Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 427; Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYUL Rev 285, 309; Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 24). It suffices for purposes of subject matter jurisdiction that section 78.01 of the Mental Hygiene Law grants jurisdiction to the Supreme Court "over the custody of a person and his property if he is

incompetent to manage himself or his affairs by reason of age * * * mental illness, or other cause", thus allowing the court to act in his best interests.[14] In a more general context, the court's jurisdiction derives from the fact that the Supreme Court is a court of "general original jurisdiction in law and equity" as provided in the New York State Constitution (art VI, § 7, subd a; see, also, Judiciary Law, § 140-b; *Matter of Seitz v Drogheo,* 21 NY2d 181, 184).

That the court has the obligation to *exercise* that power in this proceeding is equally apparent, for not to do so would constitute an abdication of our fundamental judicial responsibility to resolve a real and immediate problem with which we have been confronted. If Father Eichner could not turn to the judicial process for guidance, where or to whom could he turn? The answer to the District Attorney's call for judicial restraint pending action by the Legislature is simply that legislative action has not occurred, may not occur for years, or perhaps (given the emotional component of the issue) may not occur at all. Unlike the cases cited by the District Attorney, this proceeding does not raise issues upon which the Legislature has already expressed its views, implicitly pre-empting contrary judicial resolutions (see, e.g., *People v Broadie,* 37 NY2d 100, 117-118, cert den 423 US 950). Nor in addressing these issues do we seek to alter the course of prior legislative paths, or to usurp the power or function of the Legislature. The principle of judicial restraint and the oft-heard admonitions against legislating by the judiciary remain valid and are concepts to be borne in mind and given adherence. However, when appropriate litigants present the court with a vital problem involving private rights as well as public policy, we would be remiss if we declined to act. Clearly, it would be desirable for the State Legislature to address itself to these issues which are so interwoven with fundamental questions of public policy. But the fact is that it has not done so. And, in circumstances such as those at bar, the best interests of the

14. Article 78 of the Mental Hygiene Law merely codifies the common-law rule that jurisdiction over incompetents was vested in equity. Such jurisdiction was formerly vested in the Chancellor (see *Matter of Lofthouse,* 3 App Div 139, 142) and the Supreme Court has acquired jurisdiction over the person and property of incompetents as the successor of the Court of Chancery (see *Matter of Benedict,* 239 NY 440, 446; *Sporza v German Sav. Bank in City of N. Y.,* 192 NY 8; *Matter of Middlebrook,* 255 App Div 1021, revd on other grounds 280 NY 380; see, also, 27 NY Jur, Incompetent Persons, § 19, p 489).

patient, the anguished family and friends, the medical community, the hospital institutions, and the community at large, all demand a solution having the sanction of law. We note that there are no precedents in this State which militate against a judicial resolution of this problem. There is no body of *stare decisis;* thus, the "continuity of law" will not be disrupted. To the extent that the decisions of sister States provide guidance, no obstacle to judicial action is presented *(Matter of Quinlan,* 70 NJ 10, *supra; Superintendent of Belchertown State School v Saikewicz,* 370 NE2d 417, *supra).*

That the problem raises what may ultimately be discerned as moral questions does not mandate a contrary result. The law which embodies social policy inevitably reflects moral judgment to some degree (compare *Matter of Quinlan, supra,* p 40, with *People v Easley,* 42 NY2d 50, 56). And, in this regard, the words of Justice BENJAMIN N. CARDOZO are particularly apt: "You may say that there is no assurance that judges will interpret the *mores* of their day more wisely and truly than other men. I am not disposed to deny this, but in my view it is quite beside the point. The point is rather that this power of interpretation must be lodged somewhere, and the custom of the constitution has lodged it in the judges. If they are to fulfill their function as judges, it could hardly be lodged elsewhere. Their conclusions must, indeed, be subject to constant testing and retesting, revision and readjustment; but if they act with conscience and intelligence, they ought to attain in their conclusions a fair average of truth and wisdom." (Cardozo, The Nature of the Judicial Process, 135-136; see, also, Baron, Medical Paternalism and the Rule of Law: A Response to Dr. Relman, 4 Amer J L & Med 337.)

The Court of Appeals has long recognized the particularly urgent need for judicial vigilance in safeguarding the rights of incompetents, noting in analogous circumstances that "we cannot overlook the rights of institutional residents, especially those incapable of eloquent expression and abstract thought. These people deserve a fair hearing" *(Matter of Brown v Ristich,* 36 NY2d 183, 191-192). So too, many collateral issues of penal law violations, malpractice, life insurance and estate litigation lie near the surface of controversies such as these, presenting additional reasons for the courts to act (see Cantor, *Quinlan,* Privacy and the Handling of Incompetent Dying Patients, 30 Rutgers L Rev 243). These considerations have all contributed to our conclusion that this court must address

itself to the issues (see, also, *Satz v Perlmutter,* 362 So 2d 160, affg 362 So 2d 260 [Fla]).

This is not to say, however, that an act of the Legislature would not be most welcome and appropriate. No one seriously doubts that the "Legislature has far greater capabilities to gather relevant data and to elicit expressions of pertinent opinion on the issues at hand" *(Matter of Higby v Mahoney,* 48 NY2d 15, 18-19).[15] It is manifest to this court, however, that the consequences of our refusing to confront the issues would far outweigh the risks inherent in filling the void.

## V

Turning our attention to the substantive legal problems, we begin by recognizing that, while the right of an *incompetent* patient to refuse medical treatment or to have it withdrawn may be subject to some controversy, by contrast, the right of a *competent* patient to do so is not. There exists a solid line of case authority recognizing the undeniable right of a terminally ill but competent individual to refuse medical care, even if it will inexorably result in his death. The underlying motive for the patient's decision is irrelevant. Its legal underpinnings have been carefully considered and variously described. The Court of Appeals has affirmed that "[e]very human being of adult years and sound mind has a right to

---

15. One statutory solution to this problem adopted by at least eight States is a "Natural Death Act", whereby an individual executes a so-called "living will" (see Comment, North Carolina's Natural Death Act: Confronting Death with Dignity, 14 Wake For L Rev 771, 774-777, and especially 771, n 5, for list of jurisdictions which have enacted such legislation; see, also, Note, The Legal Aspects of the Right to Die Before and After the Quinlan Decision, 65 Ky L J 823, 872-879; Note, The "Living Will": The Right to Die with Dignity?, 26 Case W Res L Rev 485, 490; Raible, The Right to Refuse Treatment and Natural Death Legislation, Medico-legal News, Vol 5, No. 4, p 6; see, also, Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYUL Rev 285, 298-306, for a proposed New York statute). In California, for example, a "qualified patient" (i.e., an adult of sound mind with a confirmed diagnosis of terminal illness) may execute a legally binding directive evincing his desire to have life-sustaining procedures withdrawn or withheld when they will serve only to postpone the moment of death. If the individual is not a qualified patient at the time of execution, the directive, though not legally binding, remains in an advisory capacity and is entitled to some weight as to the patient's desires (see Cal Health and Safety Code, §§ 7185-7195 [Deering Supp, 1978]; for an analysis of the North Carolina Natural Death Act, N. C. Gen Stat, §§ 90-320 to 90-322 [Cum Supp, 1977], see Comment, North Carolina's Natural Death Act: Confronting Death with Dignity, 14 Wake For L Rev 771, 781-793). As Special Term correctly noted, legislation has been introduced in this State, but has not yet been enacted (Decision p 211, *citing,* e.g., S 5514.[by Sen Leichter]).

determine what shall be done with his body" *(Schloendorff v Society of New York Hosp.,* 211 NY 125, 129 [CARDOZO, J.]). Similarly, it has been stated that "it is the individual who is the subject of a medical decision who has the final say and that this must necessarily be so in a system of government which gives the greatest possible protection to the individual in the furtherance of his own desires" *(Matter of Erickson v Dilgard,* 44 Misc 2d 27, 28 [MEYER, J.]). In this regard, one United States District Court, in considering whether the terminally ill had a right to elect unconventional methods of treatment such as the use of the drug Laetrile, remarked that it was "uncontrovertible that a patient has a right to refuse cancer treatment altogether" *(Rutherford v United States,* 438 F Supp 1287, 1299, remanded 582 F2d 1234, revd 442 US 544; accord *Union Pacific Ry. Co v Botsford,* 141 US 250, 251; *Matter of Melideo,* 88 Misc 2d 974, 975 [LAZER, J.]; *Matter of Long Is. Jewish-Hillside Med. Center v Levitt,* 73 Misc 2d 395, 397; *Matter of Nemser,* 51 Misc 2d 616; *Satz v Perlmutter, supra; Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 424; *Lane v Candura,* — Mass App —, 376 NE2d 1232, 1236; *Matter of Osborne,* 294 A2d 372 [D. C.]; *Matter of Estate of Brooks,* 32 Ill 2d 361; *Palm Springs Gen. Hosp. v Martinez,* Dade County Cir Ct, July 2, 1977, Civ No. 71-12687; *Matter of Yetter,* 62 Pa D & C 2d 619; see, also, Note, "Last Rights": Hawaii's Law on the Right to Choice of Therapy for Dying Patients, 1 Hawaii L Rev 144, 153-157; Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYUL Rev 285, 306-308; Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 2-16). Essentially, it was this right of a competent patient to refuse medical care that Special Term recognized, denominating it the "right of bodily self-determination" (Decision, p 203).

In some cases, however, the right to refuse medical treatment may be overridden by countervailing "compelling State interests." Thus, for example, an individual may not refuse to be vaccinated where his refusal presents a threat to the community at large. (See *Jacobson v Massachusetts,* 197 US 11.) Moreover, the State's general interest in the preservation of life, coupled with its responsibility to act as *parens patriae* for minors or incompetents, may sometimes require that treatment be accepted. Thus, in *Long Is. Jewish-Hillside Med. Center v Levitt (supra,* p 398) the court, asserting its power of

*parens patriae,* ordered a life-saving operation for an 84-year-old man who had become confused and unable to consent for himself (accord, *Matter of Sampson,* 65 Misc 2d 658, affd 37 AD2d 668, affd 29 NY2d 900; *Matter of Weberlist,* 79 Misc 2d 753, 756, *supra; John F. Kennedy Mem. Hosp. v Heston,* 58 NJ 576; *State v Perricone,* 37 NJ 463, cert den 371 US 890; *Holmes v Silver Cross Hosp. of Joliet,* 340 F Supp 125; cf. *Roe v Wade,* 410 US 113, 152-156, *supra* [State's interest in potential life allowed it to proscribe abortions in third trimester of pregnancy]; see, also, Cantor, *Quinlan,* Privacy, and the Handling of Incompetent Dying Patients, 30 Rutgers L Rev 243, 248-250). The interests of the State are also strongly implicated where the patient is responsible for the support of minor children and where refusal to accept treatment threatens to bring about their "abandonment". Thus, in *Matter of President & Directors of Georgetown Coll.* (331 F2d 1000, 1008), treatment was ordered over the refusal of the 25-year-old mother of a seven-month-old child (see, also, *United States v George,* 239 F Supp 752). It has also been said that the State has a compelling interest in maintaining the ethical integrity of the medical profession by protecting physicians against the compelled violation of their professional standards and against exposure to the risk of civil or criminal liability (see, e.g., *Matter of President & Directors of Georgetown Coll., supra; United States v George, supra,* p 754; Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 29-33). And, lastly, it has long been recognized that the State has an interest in discouraging irrational and wanton acts of self-destruction which violate fundamental norms of society (see *Superintendent of Belchertown State School v Saikewicz,* 370 NE2d at p 426, n 11, *supra; Matter of President & Directors of Georgetown Coll., supra;* Annas, Reconciling Quinlan and Saikewicz: Decision Making for the Terminally Ill Incompetent, 4 Amer J L & Med 367, 373-374, n 19; Note, Suicide and the Compulsion of Lifesaving Medical Procedures: An Analysis of the Refusal of Treatment Cases, 44 Brooklyn L Rev 285; Byrn, Compulsory Lifesaving Treatment for the Competent Adult, *supra,* citing, *inter alia, Hales v Petit,* 75 Eng Rep 387 [C. B. 1562]).

It seems clear that predicated upon the foregoing principles of common law, had Brother Fox been fully *competent* after surgery and had he refused the assistance of a respirator, his wishes would have had to be honored, absent any countervail-

ing compelling State interest. We believe, however, that his right to refuse treatment when competent rests on a far more fundamental principle of law: the constitutional right to privacy.[16] In the landmark decision of *Roe v Wade* (410 US 113, 117-118, *supra)*, a pregnant woman challenged the constitutionality of the Texas criminal abortion statute which permitted abortions only when necessary to save the life of the mother. In striking the statute, the Supreme Court recognized that the right of personal *privacy* encompassed the decision to abort, subject only to the triggering of State interest in protecting "potential life" at some point in its development (410 US, at pp 154, 162-163). Addressing that issue, the court declared (p 152): "The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back * * * to *Union Pacific R. Co. v Botsford,* 141 U.S. 250, 251 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." This right has been discerned within the penumbras of the Bill of Rights, and from the language of the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the Constitution *(id.).*[17] However, "only

---

**16.** The petitioner specifically did not seek withdrawal of the respirator based upon the exercise of Brother Fox's First Amendment right to religious freedom. Since it has long been recognized that the First Amendment does not necessarily shield freedom of *actions* undertaken in the exercise of religion, as opposed to freedom of belief or thought (see *Reynolds v United States,* 98 US 145 [practice of polygamous marriages forbidden]; *Lawson v Commonwealth,* 291 Ky 437, 441-442, [practice of snake handling forbidden]) resort to such a theory might well have posed difficult legal problems (see *Matter of Quinlan,* 70 NJ 10, 35-38); Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 7).

**17.** Indications of the right to privacy can be found at various places in the Bill of Rights and Amendments to the Constitution: The First Amendment: *NAACP v Alabama,* 357 US 449, 462 ["freedom to associate and privacy in one's associations" is contemplated within the First Amendment]. See, also, *Stanley v Georgia,* 394 US 557, 564. Fourth and Fifth Amendments: *Terry v Ohio,* 392 US 1, 8-9 [the "right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs"]; *Katz v United States,* 389 US 347, 350 [Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion"]; *Boyd v United States,* 116 US 616, 630 [Fourth and Fifth Amendments protect against governmental invasions "of the sanctity of a man's home and the privacies of life"]. In the penumbras of the Bill of Rights, *Griswold v Connecticut,* 381 US 479, 485-486 [use of contraceptives "concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees." Searching for signs of use "is repulsive to the notions of privacy surrounding the marriage relationship."] See, also, *Eisenstadt v Baird,* 405 US 438, 453 [right of privacy "is the right of the *individual* * * * to be free from unwarranted governmental intrusion into matters * * * fundamentally affecting a person"]. Ninth Amendment: *Griswold v Connecticut,* 381 US 479, 486-487, GOLDBERG,

personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325 (1937), are included in this guarantee of personal privacy" *(Roe v Wade, supra,* p 152). While the parameters of this right are still not certain, the Supreme Court has focused on 'matters relating to marriage, procreation, contraception, family relationships, and child rearing and education" *(Paul v Davis,* 424 US 693, 713). Mr. Justice DOUGLAS, speaking of the constitutional right of privacy, declared that *"the freedom to care for one's health and person"* falls within its purview *(Doe v Bolton,* 410 US 179, 213, concurring opn), adding that the "right of privacy has no more conspicuous place than in the physician-patient relationship" *(id.,* p 219). We believe that the essence of this right is autonomy over matters of personal integrity, including control over one's body, and that such a right is fundamental within the meaning of the Fourteenth Amendment (see *Doe v Bolton,* 410 US, at p 219, *supra,* DOUGLAS, J., concurring; *Kelley v Johnson,* 425 US 238, 251, MARSHALL, J., dissenting; see, also, Beardsley, Privacy: Autonomy and Selective Disclosure, as reprinted in Privacy, Nomos XIII 56-57 [Pennock and Chapman ed, 1971]; Note, On Privacy: Constitutional Protection for Personal Liberty, 48 NYUL Rev 670, 700; G. Hughes, The Conscience of the Courts: Law and Morals in American Life, 71). Indeed, such a right is simply one facet of the right "to be let alone" *(Olmstead v United States,* 277 US 438, 478, BRANDEIS, J., dissenting), and is consistent with the Supreme Court's observation that " 'outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases' " *(Kent v Dulles,* 357 US 116, 126). *Roe* acknowledges that pregnancy—and its termination —so fundamentally affect the integrity of a woman's body that the constitutional right to privacy necessarily extended to her "decision whether or not to terminate her pregnancy" subject only to countervailing compelling State interests *(Roe v Wade,* 410 US, at p 153). By parity of reasoning, the constitutional

---

J. concurring. Fourteenth Amendment: *Meyer v Nebraska,* 262 US 390, 399 [liberty "denotes not merely freedom from bodily restraint but also the right of the individual * * * to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men"]. The right of privacy has been used in the context of the right to marry *(Loving v Virginia,* 388 US 1, 12), the right to have children *(Skinner v Oklahoma,* 316 US 535, 541-542), and the right to educate one's children *(Pierce v Society of Sisters,* 268 US 510). See, also *Doe v Bolton,* 410 US 179, 209-215, DOUGLAS, J., concurring; Cantor, *Quinlan,* Privacy, and the Handling of Incompetent Dying Patients, 30 Rutgers L Rev 243, 245-248).

right to privacy, we believe, encompasses the freedom of the terminally ill but competent individual to choose for himself whether or not to decline medical treatment where he reasonably believes that such treatment will only prolong his suffering needlessly, and serve merely to denigrate his conception of the quality of life. The decision by the incurably ill to forego medical treatment and allow the natural processes of death to follow their inevitable course is so manifestly a "fundamental" decision in their lives, that it is virtually inconceivable that the right of privacy would *not* apply to it. Individuals have an inherent right to prevent "pointless, even cruel, prolongation of the act of dying" *(Matter of Dinnerstein,* 380 NE2d, at p 137). Stated in simpler and more fundamental terms, as a matter of constitutional law, a competent adult who is incurably and terminally ill has the right, if he so chooses, not to resist death and to die with dignity (see *Rutherford v United States,* 438 F Supp 1287, 1299, *supra; Satz v Perlmutter,* 362 So 2d 160, 162, *supra; Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 426; *Matter of Quinlan,* 70 NJ 10, 39-40, *supra;* see, also, Cantor, A Patient's Decision to Decline Life-saving Medical Treatment: Bodily Integrity versus the Preservation of Life, 26 Rutgers L Rev 228; Paris, Compulsory Medical Treatment and Religious Freedom: Whose Law Shall Prevail?, 10 U San Francisco L Rev 1; Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYUL Rev 285, 294).

In reaching this conclusion, we firmly agree with the major sister State decisions on this difficult issue: *Matter of Quinlan (supra)* and *Superintendent of Belchertown State School v Saikewicz* (370 NE2d 417, *supra).* The well-publicized Karen Quinlan case presented circumstances quite similar to those at bar: The 22-year-old Ms. Quinlan lapsed into a coma from unknown causes, suffering irreversible brain damage. Her death was forestalled by the prompt use of an artificial respirator which maintained her breathing. After several months of watching his daughter remain technically "alive" but in a chronic vegetative coma, Mr. Quinlan petitioned the New Jersey Superior Court to appoint him guardian for the ultimate purpose of withdrawing the respirator, an act that all parties—erroneously as it happened—believed would result in her death (see 137 NJ Super, at pp 236-239). The New Jersey Supreme Court, in reversing the trial court's rejection of the petition, concluded, as we do, that the constitutional

right to privacy "is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances, in much the same way as it is broad enough to encompass a woman's decision to terminate pregnancy under certain conditions" *(Matter of Quinlan,* 70 NJ 10, 40, *supra,* citing *Roe v Wade,* 410 US 113, *supra).* The *Saikewicz* court was presented with an entirely different problem. Joseph Saikewicz, a 67-year-old profoundly retarded ward of the State of Massachusetts, was terminally ill with acute myeloblastic monocytic leukemia. Chemotherapy, which statistically caused remission in 30 to 50% of the cases for periods ranging from 2 to 13 months, "was the medically indicated course of treatment [although] it would cause Saikewicz significant adverse side effects and discomfort" *(Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 419). Based upon the patient's inability to provide informed consent for the chemotherapy treatment, as well as his inability to understand the treatment to which he would be subjected, the Superintendent of Belchertown State School petitioned the Probate Court for the appointment of a guardian for the ward. The guardian's recommendation was that " 'not treating Mr. Saikewicz would be in his best interests' " *(id.,* p 419). In analyzing whether the incompetent could decline potentially life-prolonging treatment if such were in his "actual interests and preferences" *(id.,* p 431), the court recognized, as did *Quinlan,* that the constitutional right to privacy obtained. The constitutional guarantee, the court noted "encompasses the right of a patient to preserve his or her right to privacy against unwanted infringements of bodily integrity in appropriate circumstances" *(id.,* p 424). On this point, we agree with the *Saikewicz* court.

■ ■ Special Term, however, was of the view that the constitutional right to privacy was not involved in this proceeding for want of the requisite element of "State action", i.e., that Nassau Hospital was acting as a "private" entity within the meaning of the Fourteenth Amendment, and its refusal to withdraw the respirator could never trigger constitutional ramifications (Decision, p 199). We cannot abide by Special Term's analysis with respect to this question. True, there is case authority for the proposition that actions by a hospital are not State action (see, e.g., *Schlein v Milford Hosp.,* 561 F2d 427; see, also, *Greco v Orange Mem. Hosp. Corp.,* 513 F2d 873, cert den 423 US 1000). But, in determin-

ing whether "State action" is present, the test does not focus on the entity *qua* entity. Rather, the existence of "State action" for Fourteenth Amendment purposes depends on "whether there is a sufficiently close nexus between the State and the *challenged action* of the regulated entity so that the action of the latter may be fairly treated as that of the State itself" *(Jackson v Metropolitan Edison Co.,* 419 US 345, 351 [emphasis supplied]; see, also, *Moose Lodge No. 107 v Irvis,* 407 US 163, 176-177). Thus, in *Schlein v Milford Hosp. (supra),* where the challenged *activity* was the rejection of staff privileges for a physician—an "activity" having minimal if any connection with the State—the court had little difficulty in rejecting the Federally based due process claim (see, also, *Barrett v United Hosp.,* 376 F Supp 791, 803, affd 506 F2d 1395). In stark contrast, it is the implied presence of the State, potentially capable of imposing criminal penalties and civil liability upon the hospital or medical staff, that has prompted this controversy. That the District Attorney has asserted what is essentially an adversary position in support of the hospital reflects this. State action was found to be present in *Roe* because the Texas statute imposed criminal sanctions for the performance of an abortion. Similarly, if the District Attorney's views prevail, the homicide statutes of this State would impose criminal penalties upon those who discontinue life-sustaining measures for Brother Fox. Furthermore, physicians are licensed by the State Board of Regents and, hence, their continued right to practice may be jeopardized by State action taken as a consequence of their conduct in termination-of-treatment situations. Indeed, the State's *parens patriae* responsibility to provide continuing supervision over the affairs of an incompetent pursuant to the Mental Hygiene Law is sufficient to establish the existence of State action herein. (Cf. *Parham v J. R.,* 442 US 584.) Consequently, we find that Nassau Hospital's rejection of Father Eichner's request constituted State action within the meaning of the Fourteenth Amendment.

■ Accordingly we conclude that, were Brother Fox competent, he could refuse medical treatment not only as an exercise of his common-law right to bodily self-determination, but also pursuant to his constitutional right to privacy. Although the two are quite clearly equivalent in effect since they compel the same result, the difference between them is something more than mere semantics. Common-law rights can be

abrogated by statute in the exercise of the State's police powers subject only to due process requirements (see McKinney's Cons Laws of NY, Book 1, Statutes, § 301 *et seq.;* cf. *Penn Cent. Transp. Co. v New York City,* 438 US 104, 123-124; *Spears v Berle,* 48 NY2d 254, 261-262; *Matter of Subway-Surface Supervisors Assn. v New York City Tr. Auth.,* 44 NY2d 101, 109-110; *Modjeska Sign Studios v Berle,* 43 NY2d 468, 473-475; *Suffolk Outdoor Adv. Co. v Hulse,* 43 NY2d 483, 489). Constitutional rights on the other hand cannot be so abrogated (see *Roe v Wade,* 410 US 113, 155, *supra; Kramer v Union Free School Dist.,* 395 US 621, 627; *Shapiro v Thompson,* 394 US 618, 634). It suffices for purposes of this analysis, however, that these two rights function in a complementary manner, simultaneously affording the incurably ill the right to determine at what point aggressive therapy should cease.

Significantly, we note that the legal conclusion we reach is consistent with a growing body of medical opinion. The judicial process has classically deferred to the medical profession to provide guidelines in determining questions involving medical standards; court decisions are ultimately shaped by medical opinions and properly so (see *Selkowitz v County of Nassau,* 45 NY2d 97, 102; *Meiselman v Crown Hgts. Hosp.,* 285 NY 389, 398; see, also, Richardson, Evidence [Prince, 10th ed], § 371, p 349; Bard and Kravitsky, New York Law of Medical Malpractice, 183). No one can seriously doubt that medical questions of life and death, particularly the propriety of medical treatment for the terminally ill, are matters calling for the consideration of professional medical opinion. The consensus gleaned from the medical literature on the subject indicates that increasingly the medical community has come to recognize and acknowledge that the terminally ill, and particularly those patients in irreversible comas, need care and comfort, not extraordinary, life-sustaining therapy.[18] Thus, one set of recently suggested guidelines for the care of the terminally ill stated:

"Once treatment for disease is ineffective, care should be designed for comfort rather than survival. The physician

---

18. There is a growing body of literature discussing the problems facing the dying patient in hospitals (see, e.g., The Dying Patient [O. Brim ed, 1970]; Ethical Issues in Death and Dying [R. Weir ed, 1977]; H. Feifel, New Meanings of Death; E. Kubler-Ross, On Death and Dying; D. Sudnow, Passing On; R. Veatch, Death, Dying and the Biological Revolution; G. Williams, The Sanctity of Life and the Criminal Law; see, also, Annas, Death and Dying, Civ Lib Rev, July, 1978, p 71).

should discuss the alternatives of continuing the primarily disease-oriented treatments versus shifting to a person-oriented, comfort care approach.

"Thus at some point a decision is made to halt aggressive disease therapy and a plan is adopted to relieve symptoms rather than prolong the dying process." (Schmale & Patterson, Comfort Care Only—Treatment Guidelines for the Terminal Patient, Psychosocial Care for the Dying Patient 13, 15 [Garfield ed, 1978].)

Another commentator of medical ethics has urged that: "We should not use *extraordinary* means of prolonging life or its semblance when, after careful consideration, consultation and the application of the most well conceived therapy it becomes apparent that there is no hope for the recovery of the patient. Recovery should not be defined simply as the ability to remain alive; it should mean life without intolerable suffering." (Lewis, Machine Medicine and Its Relation to the Fatally Ill, 206 JAMA 387, 389; also quoted in *Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 424, *supra.)* [19]

Additionally, the ethical stance of the medical community in this regard is accurately reflected, not merely by opinon surveys (see, e.g., Lupo, Determining the Right to Die—A Physician's Responsibility, 63 J Fla Med Ann 243), but by the fact that many physicians actually engage in the practice of omitting life-prolonging procedures or medication for the terminally ill, and simply fail to resuscitate when otherwise such treatment would be indicated. The National Conference on Standards for Cardiopulmonary Resuscitation (CPR), for example, expressed the policy as follows: "The purpose of cardiopulmonary resuscitation is the prevention of sudden, unexpected death. Cardiopulmonary resuscitation is not indicated in cer-

19. See, e.g., Jaretzki, Death with Dignity-Passive Euthanasia, 76 NYSJ Med 539-543; Dunphy, On Caring for Patients with Cancer, 295 NEJ Med 313; Vodiga, Euthanasia and the Right to Die—Moral, Ethical and Legal Perspectives, 51 Chi Kent L Rev 1, 24; Comment, Medical and Legal Views of Death: Confrontation and Reconciliation, 19 St Louis ULJ 172, 178; Beecher, Ethical Problems Created by the Hopelessly Unconscious Patient, 278 NEJ Med 1425; Elkington, The Dying Patient, the Doctor and the Law, 13 Vill L Rev 740, 743; Williamson, Life or Death—Whose Decision?, 197 JAMA 793; cf. Campbell & Duff, Deciding the Care of Severely Malformed or Dying Infants, 5 J Med Ethics 65-67; Horan, Euthanasia, Medical Treatment and the Mongoloid Child: Death as a Treatment of Choice, 27 Baylor L Rev 76, 82; Power of Court to Order or Authorize Discontinuation of Extraordinary Medical Means of Sustaining Human Life, Ann. 79 ALR3d 237. For an example of an author expressing a contrary ethical viewpoint, see Skegg, Irreversibly Comatose Individuals: "Alive" or "Dead"?, 33 Camb L J 130, 137, n 28.

tain situations, such as in cases of terminal irreversible illness where death is not unexpected or where prolonged cardiac arrest dictates the futility of resuscitation efforts. Resuscitation in these circumstances may represent a positive violation of an individual's right to die with dignity. When CPR is considered to be contraindicated for hospital patients, it is appropriate to indicate this in the patient's progress notes. It also is appropriate to indicate this on the physician's order sheet for the benefit of nurses and other personnel who may be called upon to initiate or participate in cardiopulmonary resuscitation." (National Conference on Standards for Cardiopulmonary Resuscitation and Emergency Cardiac Care, Standards for Cardiopulmonary Resuscitation [CPR] and Emergency Cardiac Care [ECC], 227 JAMA 837, 864.)[20] Recognition of this fact prompted the *Quinlan* court to comment that "physicians distinguish between curing the ill and comforting and easing the dying; * * * they refuse to treat the curable as if they were dying or ought to die, and * * * they have sometimes refused to treat the hopeless and dying as if they were curable" *(Matter of Quinlan,* 70 NJ, at p 47; see, also, *Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at pp 423-424, *supra; Matter of Dinnerstein,* 380 NE2d, at p 137, nn 6, 7). Consequently, we find that the current state of medical ethical opinion largely supports the right of the terminally ill to refuse treatment and to allow the natural process of death to run its course.

## VI

█ We further conclude that by standards of logic, morality and medicine the terminally ill should be treated equally, whether competent or incompetent. Can it be doubted that the "value of human dignity extends to both"? (see *Superintendent of Belchertown State School v Saikewicz, supra,* pp 423, 427, 428; cf. *Matter of Brown v Ristich,* 36 NY2d 183, 191-192, *supra;* Mental Hygiene Law, § 33.01). What possible societal policy objective is vindicated or furthered by treating the two

---

20. To the same effect, see Grenvick, et al., Cessation of Therapy in Terminal Illness and Brain Death, 6 Critical Care Medicine 284; Rabkin, Gillerman and Rice, Orders Not to Resuscitate, 293 NEJ Med 364; D. Crane, The Sanctity of Social Life: Physician's Treatment of Critically Ill Patients, as reviewed in Hastings Center Rep, June, 1976, at p 31; Levine, Disconnection: The Clinician's View, Hastings Center Rep, Feb., 1976, at p 11; see, also, Hirsch and Donovan, The Right to Die: Medico-Legal Implications of In Re Quinlan, 30 Rutgers L Rev 267, 268, n 10.

groups of terminally ill *differently?* What is gained by granting such a fundamental right only to those who, though terminally ill, have not suffered brain damage and coma in the last stages of the dying process? The very notion raises the spectre of constitutional infirmity when measured against the Supreme Court's recognition that incompetents must be afforded all their due process rights; indeed any State scheme which irrationally denies to the terminally ill incompetent that which it grants to the terminally ill competent patient is plainly subject to constitutional attack (see *O'Connor v Donaldson,* 422 US 563, 574-575; *McNeil v Director, Patuxent Inst.,* 407 US 245, 249; *Jackson v Indiana,* 406 US 715, 727, 730; *Humphrey v Cady,* 405 US 504, 508; *Baxstrom v Herold,* 383 US 107, 111-113; *Matter of Torsney,* 47 NY2d 667, 674-675, *supra; People ex rel Henig v Commissioner of Mental Hygiene,* 43 NY2d 334, 338; cf. *Addington v Texas,* 441 US 418, 426; see, also, Note, Developments in the Law of Civil Commitment of the Mentally Ill, 87 Harv L Rev 1190).

It is not enough, however, simply to declare that the terminally ill patient in a chronic coma is entitled to refuse further medical treatment: We are bound by *Roe v Wade* (410 US 113, 154-155, *supra),* to determine whether the exercise of that right contravenes some countervailing State interest (see *Matter of President & Directors of Georgetown Coll.,* 331 F2d 1000, *supra),* and we therefore measure the relief requested herein against the four major categories of relevant State interests.

(1) *Preservation and sanctity of life:* The principal State interest to be protected in this proceeding, as in *Roe,* is the preservation of the sanctity of life (see *Roe v Wade, supra,* pp 162-163). Yet, the patient in a permanent vegetative coma has no hope of recovery and merely lies, trapped in a technological limbo, awaiting the inevitable. As a matter of established fact, such a patient has *no* health and, in the true sense, no life, for the State to protect. Thus, the use of a respirator, or any other extraordinary means of life support, *under these circumstances,* does not serve to advance the State's interest in protecting health or life and, hence, that interest does not defeat the privacy right asserted here (see Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYUL Rev 285, 293, n 54). Indeed, with *Roe* in mind, it is appropriate to note that the State's interest in preservation of the life of the fetus would appear to be

*greater* than any possible interest the State may have in maintaining the continued life of a terminally ill comatose patient. The fetus is a potential person who, in the natural course, will develop into a whole functional human being; the terminally ill patient in a permanent vegetative coma, in striking contrast, has in most cases already enjoyed his life and now, at the last hour, depends for his continued existence upon an extraordinary life-sustaining technology. Such claim to personhood is certainly no greater than that of the fetus. Both the *Quinlan* and *Saikewicz* courts made similar determinations in this regard. The analysis of the *Quinlan* court was that (70 NJ, at p 41) "the State's interest *contra* weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest". Equally articulate, the *Saikewicz* court declared: "The interest of the State in prolonging a life must be reconciled with the interest of an individual to reject the traumatic cost of that prolongation. There is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether but when, for how long, and at what cost to the individual that life may be briefly extended." (370 NE2d, at pp 425-426);

(2) *Protection of third parties:* This State interest turns on the facts of the particular controversy. It is incumbent upon Special Term to examine what potential harm may arise to dependents as a result of the patient's death and to consider such effect as one factor in the ultimate decision. In the case at bar, the 83-year-old Brother Fox had no dependents to "abandon"; accordingly, this State interest does not affect the outcome of this controversy;

(3) *Maintenance of the ethical integrity of the medical profession:* As previously alluded to, withdrawal of any extraordinary life-support systems for the terminally ill in an irreversible vegetative coma is consistent with and largely supported by the current state of medical ethics (see nn 18-19, *supra).* The problem of potential liability to the hospital or medical staff (see *Matter of President & Directors of Georgetown Coll.,* 331 F2d, at p 1009) can be obviated by protective provisions in the order ultimately issued (see *Matter of Quinlan,* 70 NJ, at p 54);

(4) *Prevention of suicide:* Upon analysis, this protective

State interest, under the circumstances at bar, is not compelling either. At common law, suicide required a *specific intent to die* (Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 18; see, also, Note, Compulsory Medical Treatment: The State's Interest Re-evaluated, 51 Minn L Rev 293, 303). But withdrawal of the respirator evinces only an intent to forego extraordinary measures and to allow the processes of nature to run their course. The legislative history of the criminal suicide statutes supports this analysis. Formerly, attempted suicide was a criminal offense (former Penal Code, §§ 174, 178; L 1881, ch 676) which at common law worked a forfeiture of property (see *Darrow v Family Fund Soc.,* 116 NY 537). The common law was changed by statute to abolish the crime of attempted suicide (former Penal Law, §§ 2302, 2303, repealed by L 1919, ch 414, § 1), and to recognize that suicide was merely "a grave public wrong" (former Penal Law, § 2301). By 1890, suicide was no longer considered a crime in this State (see, e.g., *Meacham v New York State Mut. Benefit Assn.,* 120 NY 237, affg 46 Hun 363). The current Penal Law provides for criminal liability solely as to a third party who aids or promotes the suicide attempt; it does not impose liability against the *individual* himself (see Penal Law, §§ 120.30, 120.35). Hence, there seems to be no public policy against permitting a terminally ill patient to choose not to delay the inevitable and imminent termination of his life—at least insofar as public policy is reflected in the current Penal Law. Such decision, directed to terminating the artificial prolongation of life, cannot be deemed "irrational" in the sense generally connoted by the term "suicide".

We conclude, therefore, that there were no State interests sufficiently compelling in this proceeding to have precluded Brother Fox from exercising his right to discontinue life-prolonging medical treatment.

## VII

To conclude that the terminally ill comatose patient, like his fully conscious and competent counterpart, has a right to refuse medical tratment necessarily implies that there exists a corresponding capability to exercise that right; were this not so the right would be an empty one, reduced to a meaningless "form of words", illusory and devoid of substance (see *Mapp v Ohio,* 367 US 643, 655; cf. *Entwistle v Entwistle,* 61 AD2d 380, 384, app dsmd 44 NY2d 851). This right, the *Quinlan* court

noted, "should not be discarded solely on the basis that [the incompetent's] condition prevents [a] conscious exercise of the choice" *(Matter of Quinlan,* at p 41). Yet another difficult problem surfaces at this juncture: when and under what conditions can the terminally ill comatose patient exercise this right? The medical component clearly revolves around prognosis: when does the patient's illness become so grave and his prospects for recovery so dim, that his right to decline further treatment attaches? The legal component concerns the mechanism by which the patient's intentions are ascertained, if possible, and his best interests safeguarded.

The necessary medical criteria for the activation of the patient's right are self-apparent: he must be terminally ill; he must be in a vegetative coma characterized by the physician as "permanent", "chronic" or "irreversible"; he must lack cognitive brain function; and the probability of his ever regaining cognitive brain function must be extremely remote. The State's interest in protecting the sanctity of life will tolerate no less stringent medical standard than this (see *Matter of Quinlan,* at pp 50-51). In this regard, however, the District Attorney has raised the issue of *the burden of proof* necessary to satisfy this medical standard. He argues that nothing less than proof beyond a reasonable doubt will suffice to establish the appropriate medical criteria. This contention is based on the assumption that the termination of a human life should rest upon a determination necessitating the "strongest level of proof"; moreover, since in all likelihood death will result, the District Attorney contends that the proceeding is analogous to the "imposition of death" in a criminal proceeding requiring the beyond a reasonable doubt standard. We decline to apply this standard. Proceedings under the Mental Hygiene Law—including incompetency proceedings—are civil in nature (cf. *Matter of Torsney,* 47 NY2d 667, 673, *supra)* and the " 'beyond a reasonable doubt' standard historically has been reserved for criminal cases" *(Addington v Texas,* 441 US 418, 428, *supra).* Under the circumstances present herein, by no stretch of the imagination can the State be deemed to be "taking life" in a manner analogous to the imposition of a death penalty in a criminal action. This judicial proceeding is not directed towards the imposition of a penalty for criminal activity but, rather, towards the furtherance of the best interests of the comatose and terminally ill patient. By the same token, however, we cannot abide by the

suggestion that a "preponderance of the credible evidence" standard, common to most civil proceedings, would be sufficient here. Rather, we elect the middle tier standard of proof, that of "clear and convincing evidence." As recently discussed by the *Addington* court, this standard is appropriate where the "interests at stake * * * are deemed more substantial than mere loss of money * * *. Similarly * * * the 'clear, unequivocal and convincing' standard of proof [is used] to protect particularly important individual interests in various civil cases. See, e.g., *Woodby v INS,* [385 US 276], 285" *(Addington v Texas, supra,* p 424).[21] The exercise of the right to refuse treatment by the terminally ill comatose individual clearly falls within such "particularly important individual interests", and demands that a judicial finding be supported by the "clear and convincing" quantum of proof. While the qualitative meaning of the phrase, "clear and convincing evidence" has been variously described (see, e.g., *Amend v Hurley,* 293 NY 587, 595; *Porter v Commercial Cas. Ins. Co.,* 292 NY 176, 181; *Christopher & Tenth St. R. R. Co. v Twenty-Third St. Ry. Co.,* 149 NY 51, 58; *Commissioner of Public Welfare of City of N. Y. v Ryan,* 238 App Div 607, 608), we believe it requires a finding of high probability and we are content to rest upon a recent observation by the Court of Appeals: "[T]he evidentiary requirement ' "operate[s] as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory" ' " *(Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 220, quoting *Southard v Curley,* 134 NY 148, 151). In the case at bar, there can be no dispute that the requisite standard of proof has been met.

All the medical experts testifying before Special Term agreed that Brother Fox was terminally ill; he had suffered severe brain damage to those areas of the brain involving

21. That the "clear and convincing evidence" standard is utilized only where the "interests at stake" are deemed more significant than ordinary is borne out by those other causes of action where the standard also applies: reformation of a contract (see *Ross v Food Specialties,* 6 NY2d 336); for a charge of fraud *(United States v American Bell Tel. Co.,* 167 US 224); a filiation proceeding *(Commissioner of Public Welfare of City of N. Y. v Ryan,* 238 App Div 607); an action based upon a claim against a deceased *(Matter of Cady,* 211 App Div 373). (See Richardson, Evidence [Prince, 10th ed], § 97, p 75; 9 Wigmore, Evidence [3d ed], § 2498, subd [3], pp 329-335.) In addition, the Federal courts require this proof in denaturalization proceedings *(Schneiderman v United States,* 320 US 118) and deportation proceedings *(Woodby v Immigration Servs.,* 385 US 276, 286).

cognitive or sapient function; he had likewise suffered a substantial loss of independent respiratory function; the brain damage had been caused by anoxia-oxygen deprivation of the brain for an unknown period of time approximating five minutes; and that as a result Brother Fox was in a vegetative coma. Dr. Kelly, the attending physician, as well as Dr. Poloukhine, characterized the coma as "irreversible" and "permanent" and agreed that, to a reasonable degree of medical certainty, Brother Fox would never regain cognitive function. While neither Dr. Goldensohn nor Dr. Beresford, testifying on behalf of the District Attorney, described the vegetative state as "permanent", they were nevertheless in accord as to the chances for Brother Fox's return of cognitive function: Dr. Goldensohn indicated that chances were "extremely remote" and "entirely improbable"; Dr. Beresford stated that it was "highly improbable" for such a patient to regain cognitive function. The only real medical conflict dealt with whether Brother Fox had reached a state of neurological stabilization; that is to say, whether he was still improving. But even so, those who questioned stabilization conceded that any improvement related strictly to autonomic, vegetative function, rather than cognitive ability. Accordingly, we find that, by clear and convincing evidence, the rigid medical standards necessary for the exercise of Brother Fox's right to refuse extraordinary life-prolonging treatment had been satisfied. Special Term's findings of medical facts were accurate and are affirmed.

## VIII

We turn next to an examination of the manner by which Brother Fox's right could be exercised. How can the "consent" of a comatose man be obtained? We cannot but emphasize that there must exist a mechanism to ascertain and to implement the patient's consent. To deny the exercise because the patient is unconscious is to deny the right. The task of ascertaining whether the patient would wish to exercise this right is, of course, considerably easier where he has unequivocally expressed a desire not to have his life prolonged beyond a certain point by artificial means; this is particularly true if the expression of intent—a "living will" so to speak—was made at a time when the patient contemplated the catastrophic medical possibility which ultimately befell him. For in such a case, all concerned may rest easy in the knowledge

that they are merely carrying out the stated wishes of the patient and, therefore, face no moral dilemma. The bringing to fruition of the patient's desires in such a case "is an expression the sanctity of individual choice and self-determination as fundamental constituents of life" *(Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 426). Only then can it be said with virtual assurance that were the patient "miraculously lucid for an interval * * * and perceptive of [the] irreversible condition" facing him, he himself would make the same choice *(Matter of Quinlan,* at p 39). There was persuasive evidence that such had been the case with Brother Fox. Special Term found that during discussions with Father Eichner and Father Keenan regarding the recent Karen Quinlan situation, Brother Fox had expressed his desires and intentions *not* to have his life prolonged by extraordinary and artificial means. Of greater significance, in terms of proximity, at about the time that Brother Fox learned he would enter the hospital for the operation—sometime in mid-September—he repeated these views to Father Keenan. These latter expressions—closely connected in time to the operation and referable to it—are highly probative of his choice. Common sense dictates that when an 83-year-old man undergoes surgery—even "routine" surgery—he contemplates the possibility of death. These findings of fact as to Brother Fox's intentions are entitled to great weight and we see no reason to disturb them (see *67 Wall St. Co. v Franklin Nat. Bank,* 37 NY2d 245, 248; *Amend v Hurley,* 293 NY 587, 594, *supra; cf People v Castillo,* 47 NY2d 270, 277; *People v Gruttola,* 43 NY2d 116, 122). The District Attorney argues that these expressions were merely theoretical and, in any event, hearsay which must be disregarded. This argument is untenable. Statements demonstrating the declarant's state of mind are admissible when relevant. When a declaration is offered to establish the state of mind, rather than the truth of any objectively verifiable underlying fact, then that declaration, although technically hearsay, is admissible as part of the *res gestae* (see *Provenzo v Sam,* 23 NY2d 256, 262; *Matter of Putnam,* 257 NY 140, 144; *Hine v New York El. R. R. Co.,* 149 NY 154; *Brown v Nassau Elec. R. R. Co.,* 213 App Div 834; Uniform Rules of Evidence [1974], rule 803, subd [3]; see, also, Richardson, Evidence [Prince, 10th ed], § 288, pp 256-257; Fisch, New York Evidence [2d ed], §§ 997, p 572; Note, In Re Quinlan: Defining the Basis for Terminating Life Support Under The Right of Privacy, 12 Tulsa L J 150, 163-164). So

too, the *allocutio* of Pope Pius XII on the moral implications of withdrawing extraordinary life support was admissible as probative of the basis for Brother Fox's state of mind concerning this question (see *Ferrara v Galluchio,* 5 NY2d 16, 20; see, also, *Matter of Quinlan,* at pp 30-33). This proof was particularly important in view of the testimony that Brother Fox was a devoutly religious person and that he had stated his agreement with and approval of the Pope's position. In any event, in assessing hearsay evidence, we give due regard to Judge FULD's admonition: "The common law of evidence is constantly being refashioned by the courts of this and other jurisdictions to meet the demands of modern litigation * * *. Absent some strong public policy or a clear act of pre-emption by the Legislature, rules of evidence should be fashioned to further, not frustrate, the truth-finding function of the courts" *(Fleury v Edwards,* 14 NY2d 334, 340-341 [FULD, J., concurring], quoted in *Matter of Brown v Ristich,* 36 NY2d 183, 190, supra).

We therefore conclude, as did Special Term, that Father Eichner as committee of the incompetent, was entitled to the relief he sought upon satisfaction of certain conditions, *infra;* specifically, there was evidence sufficient to permit Father Eichner to exercise Brother Fox's right to have the life-support respirator withdrawn.

## IX

But the question does not end there for we recognize that a specific statement of intent by the patient will occur only in a minority of cases. Another mechanism is required if the comatose patient's right to refuse extraordinary life prolonging medical treatment is to be safeguarded. Both *Quinlan* and *Saikewicz* faced the problem, although in different contexts: in *Quinlan* the 21-year-old Karen, in the full flower of her health, had no reason to contemplate the possibility of death and therefore no reason to make known her wishes; in *Saikewicz,* the 67-year-old retardate had an I.Q. of 10, and a mental age of less than three, and hence was incapable of intelligently expressing his wishes (see *Matter of Quinlan,* at p 18; *Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at pp 428-431). Both courts, however, elected a similar procedural mechanism: a "substitute" or proxy judgment by the patient's guardian in the best interests of the incompetent patient. This was no great departure from the

norm since "[c]ourts in the exercise of their *parens patriae* responsibility to protect those under disability have sometimes implemented medical decisions and authorized their carrying out under the doctrine of 'substituted judgment.' *Hart v. Brown,* 29 Conn. Supp. 368 * * *; *Strunk v Strunk,* 445 S. W. 2d 145, 147-148 [Ky.])" *(Matter of Quinlan,* at p 44: see, also, *Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at pp 430-431). The *Quinlan* court held that the "only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment * * * as to whether she would exercise it in these circumstances" *(Matter of Quinlan,* at p 41). Similarly, the guardian ad litem in *Saikewicz* was required to make a substitute judgment based on the "incompetent person's actual interests and preferences" *(Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 431; see, also, Cantor, Quinlan, Privacy, and the Handling of Incompetent Dying Patients, 30 Rutgers L Rev 243, 251-254). We believe that this is essentially a sound approach, borne of the exigencies of the circumstances. We look particularly to a close family relative, a spouse, parent, child, brother, sister or grandchild—in Brother Fox's case, a member of his religious family—as an appropriate person to initiate, as committee of the incompetent, the process of reaching such a decision. Such an individual who has known and loved the patient personally, presumably for years, can best determine what that patient would have wanted under the circumstances. It is a decision we trust that will derive from a deep and abiding respect for the patient as an individual. But more important, we believe that it must be based on the assumption that the patient would have wanted it that way. This approach seeks to fulfill what would be deemed to be the dying patient's own wishes, and reaffirms notions of self-determination. The committee's responsibility in this regard is, indeed, awesome. Yet, to disregard this responsibility and to maintain the *status quo* in light of the compelling and painful circumstances would be intolerable. We note that the doctrine of substitute judgment is not unknown in this jurisdiction in incompetency proceedings (see *Matter of Hills,* 264 NY 349, 354; *Matter of Baby Boy K,* 99 Misc 2d 129, 131; *Matter of Foley,* 39 Misc 2d 312, 313). And the committee's decision, under the particular circumstances, can always be tested in court as to whether it is in the best interests of the patient *(Matter of McGuinness,* 290

NY 117; cf. *Matter of Aho,* 39 NY2d 241, 246; Mental Hygiene Law, § 78.01).

X

The final problem concerns the actual implementation of the right of the terminally ill but comatose patient to refuse extraordinary medical treatment. *Quinlan* and *Saikewicz* present two divergent models of implementation. *Quinlan* provided that (p 54): "Upon the concurrence of the guardian and family of Karen, should the responsible attending physicians conclude that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state and that the life-support apparatus now being administered to Karen should be discontinued, they shall consult with the hospital 'Ethics Committee' or like body of the institution in which Karen is then hospitalized. If that consultative body agrees that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state, the present life-support system may be withdrawn and said action shall be without any civil or criminal liability therefor on the part of any participant, whether guardian, physician, hospital or others." In the view of the *Quinlan* court, the decision to terminate was, in the final analysis, a purely medical one: the injection of the judicial process would constitute a "gratuitous encroachment upon the medical profession's field of competence" *(Matter of Quinlan,* at p 50).

This approach has been criticized, not only because it arguably constitutes an improper shifting of "the ultimate decision-making responsibility away from the duly established courts of proper jurisdiction" to the ethics committee of the hospital *(Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 434), but more significantly because the ethics committee,[22] as an *institution,* is an ill-defined, amorphous body, which in some hospitals may not even exist (see,

---

22. It has been suggested that since that since the "Ethics Committee" provides merely a confirmation of medical *prognosis* and renders no "ethical" opinion, it should be denominated more properly the "Prognosis Committee" (see Annas, Reconciling *Quinlan* and *Saikewicz:* Decision Making for the Terminally Ill Incompetent, 4 Amer J L & Med 367, 369). In recognition of this fact, guidelines, indorsed by the New Jersey Attorney-General, Department of Health and Board of Medical Examiners, were issued and characterized such a body as a "prognosis committee" (see Hirsch and Donovan, The Right to Die: Medico-Legal Implications of In Re Quinlan, 30 Rutgers L Rev 267, 286).

e.g.,Hirsch and Donovan, The Right to Die: Medico-Legal Implications of In Re Quinlan, 30 Rutgers L Rev 267, 276, 280-285). Hence, uniformity of the decision-making process could never be guaranteed under the *Quinlan* model, and for these reasons, the *Saikewicz* court rejected it (see *Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 434). Instead, *Saikewicz* provided that final decision making must reside with the judicial process and the judicial process alone *(Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at pp 434-435).[23] This alternate implementation model has, in turn, engendered criticism that the judicial process is wrongfully injecting itself into what is essentially a medical decision (see Relman, The Saikewicz Decision: A Medical Viewpoint, 4 Amer J L & Med 233, 234; Relman, The Saikewicz Decision: Judges as Physicians, 298 N E J Med 508, 509; Dunn, Who "Pulls the Plug:" The Practical Effect of the Saikewicz Decision, Medicolegal News [Winter, 1978]; see, also, Annas, Reconciling Quinlan and Saikewicz: Decision Making for the Terminally Ill Incompetent, 4 Amer J L & Med 367, 369-371, 395). Contrary to the opinion expressed in some circles, we do not view the *Saikewicz* decision as evincing a "total distrust of physicians' judgments" or a "resounding vote of 'no confidence' in the ability of physicians and families to act in the best interests of the incapable patient suffering from a terminal illness" (Relman, The Saikewicz Decision: Judges as Physicians, 298 N E J Med 508). The judicial process is neither ignorant of nor insensitive to the needs and expertise of the medical community on intersecting issues. In reaching a determination the courts *must* rely upon the medical profession in deciding the medical aspects of the problem; we recognize the primacy of the medical profession as to those aspects. But, there are other significant considerations involved, such as the wishes of the patient to the extent ascertainable, religious factors where present, the views of the family, and the concerns of society. We agree with the *Saikewicz* court that the neutral presence of the law is necessary to weigh these factors, and, thus, judicial intervention is required before any life-support system can be withdrawn. We are

---

23. The Appeals Court of Massachusetts, in *Matter of Dinnerstein* (380 NE2d 134, 138, 137, nn 5, 6), has subsequently construed *Saikewicz* as not requiring mandatory judicial applications in the case of any hopelessly ill patient "in the terminal stages of an unremitting, incurable mortal illness", where "death must come soon". *Dinnerstein* confined the *Saikewicz* guidelines to those cases that offered "a life-saving or life-prolonging treatment alternative" *(id.,* p 139).

convinced that "questions of life and death * * * require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of government was created" *(Superintendent of Belchertown State School v Saikewicz,* 370 NE2d, at p 435). Certainly, this bespeaks no distrust of the good faith or competence of the physician, for courts inevitably must trust the doctor's judgment as to medical prognosis. Rather, our decision recognizes that the societal interests to be safeguarded are so great that the courts have no choice but to intervene and examine each case on an *individual,* patient-to-patient basis.[24] Just as a hospital or physician must seek a court order prior to giving a blood transfusion to a child over the religious objections of his parents, we believe that the hospital or physician must seek a court order in situations such as the one at bar.

## XI

Accordingly, we hold that the following procedure shall be applicable to the proposed withdrawal of extraordinary life-sustaining measures from the terminally ill and comatose patient. The physicians attending the patient must first certify that he is terminally ill and in an irreversible, permanent or chronic vegetative coma, and that the prospects of his regaining cognitive brain function are extremely remote. Thereafter, the person to whom such certification is made, whether a member of the patient's family, someone having a close personal relationship with him, or an official of the hospital itself, may present the prognosis to an appropriate hospital committee. If the hospital has a standing committee for such purposes, composed of at least three physicians, then that committee shall either confirm or reject the prognosis. If the hospital has no such standing committee, then, upon the petition of the person seeking relief, the hospital's chief administrative officer shall appoint such a committee consisting of no fewer than three physicians with specialties relevant to the patient's case. Confirmation of the prognosis shall be by a majority of the members of the committee, although lack of unanimity may later be considered by the court.

Upon confirmation of the prognosis, the person who secured it may commence a proceeding pursuant to article 78 of the

---

24. By this decision, we make no reference to cases of "brain death" or any other medical situation in which "no code" orders would presently be written without judicial approval.

Mental Hygiene Law for appointment as committee of the incompetent, and for permission to have the life-sustaining measures withdrawn. The Attorney-General and the appropriate District Attorney shall be given notice of the proceeding and, if they deem it necessary, shall be afforded an opportunity to have examinations conducted by physicians of their own choosing. Additionally, a guardian ad litem shall be appointed to assure that the interests of the patient are indeed protected by a neutral and detached party wholly free of self-interest.

Where this procedure is complied with, and where the court concludes, consistent with the principles announced herein, that the extraordinary life-sustaining measures should be discontinued, no participant—either medical or lay—shall be subject to criminal or civil liability as a result of the termination of such life-sustaining measures. Should death occur, its proximate cause shall be deemed to be whatever caused the patient to lapse into the coma in the first instance.

We recognize that, at first blush, the procedure we require may appear cumbersome and too time-consuming to accommodate the need for speedy determinations in cases where termination of treatment is proposed. We believe, however, that such procedure is both necessary for the protection of the rights of the incompetent and fully capable of expeditious completion through the co-operation of movants, physicians and Judges all aware of the urgency which such situations present. Indeed, since we deal with profound issues of human life and of death with dignity, our society can tolerate no less thorough procedure and will expect nothing short of the best efforts of those involved to reach a decision with all possible speed.

As we have previously noted, the issues raised herein demand that a structural legal framework be created for future cases. We would consider it a veritable dereliction of our duty to decline to design a reasonable scheme at this time. In formulating this procedure, we are fully aware that the very nature of these issues will continue to provoke a wide-ranging disparity of views regarding the societal implications of the solution we have reached. Yet we are convinced that the framework we establish will serve both to protect the interests of the terminally ill and to ameliorate a difficult ethical problem facing the medical profession. Moreover, we firmly believe that by providing a procedure for the exercise of the

right of the comatose and terminally ill to permit the immutable processes of nature to run their course, we ultimately affirm the dignity and worth of human life.

The order of Special Term should be modified in accordance with the foregoing opinion. As so modified, the order should be affirmed.

Lazer, Mangano, Margett and O'Connor, JJ., concur.

Order of the Supreme Court, Nassau County, dated December 12, 1979, modified, on the law, by deleting the fourth decretal paragraph thereof and substituting therefor provisions in accordance with the opinion herein. As so modified, order affirmed, without costs or disbursements.